Randy Nussbaum (SBN 006417)
Randy.Nussbaum@sackstierney.com
Michael L. Kitchen (SBN 019848)
michael.kitchen@sackstierney.com
SACKS TIERNEY P.A.
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, AZ 85251-3693
Telephone: 480.425.2600

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sukhi Ghuman and Kiran Ghuman, husband and wife, and residents of the State of Arizona, Octavian Security Americas, L.L.C., and Arizona Limited Liability Company;<br><br>　　　　Plaintiffs,<br><br>v.<br><br>Nicholas Nicholson, a resident of the United Kingdom,<br><br>　　　　Defendant. | No. CV-20-2474-PHX-DLR<br><br>**AMENDED COMPLAINT**<br><br>Hon. Douglas L. Rayes |

Plaintiffs Sukhi Ghuman and Kiran Ghuman (collectively "Plaintiffs"), for their Complaint against Nicolas Nicholson ("Defendant"), hereby allege and state as follows.

**PARTIES JURISDICTION AND VENUE**

1. Plaintiff Sukhi Ghuman is a married individual who resides in Maricopa County, Arizona.

2. Plaintiff Kiran Ghuman is a married individual who resides in Maricopa County, Arizona

3. Plaintiff Octavian Security Americas, L.L.C. is an Arizona limited liability company with its principal place of business in Maricopa County, Arizona.

4. Defendant is an individual who resides in the United Kingdom.

5. Upon information and belief Defendant may be married. To the extent that

2957407.v1

Defendant is married, he took all actions for the benefit of his marital community.

6. Venue and jurisdiction are proper in this Court.

## GENERAL ALLEGATIONS

7. Plaintiff Sukhi Ghuman is a businessman who has extensive experience in the physical security industry.

8. Plaintiff Sukhi Ghuman has built up an exceptional global reputation in his profession, and he relies upon that reputation and the goodwill he has generated in order to attract business, employment opportunities, and investors.

9. Plaintiffs previously lived in the United Kingdom through November 2012.

10. Plaintiff Sukhi Ghuman was previously associated with Octavian Security Limited.

11. Plaintiff Sukhi Ghuman and Defendant entered into serious disagreements regarding the cessation of operations of Octavian Security Limited.

12. Defendant caused a petition for involuntary bankruptcy to be filed in the United Kingdom against Plaintiff Sukhi Ghuman to have him declared involuntarily bankrupt in 2015, case number CR20-15-008992.

13. Judgment was entered against Plaintiff Sukhi Ghuman in default, as both he and his wife were unable to attend the final hearing due to the sudden and traumatic death, via suicide, of Mrs. Ghuman's sister.

14. Upon information and belief, representations were made to the judge that Plaintiff Sukhi Ghuman was and should have been able to travel to the hearing.

15. To the extent these representations were made, they were untrue.

16. Plaintiff Sukhi Ghuman was not a resident of Great Britain at the time, and has lived in Scottsdale, Arizona since approximately November 2012.

17. Upon information and belief, Defendant did not disclose that Sukhi Ghuman, along with his family, had relocated to the United States of America.

18. To the extent Defendant believed that relief was appropriate, Defendant should have sought relief in the United States pursuant to United States law.

2

2957407.v1

19. Despite several threats to obtain a bankruptcy judgment against Kiran Ghuman, and despite the similarity of her position as to Sukhi Ghuman, Defendant never obtained a bankruptcy judgment against her.

20. Upon information and belief, Defendant did not seek judgment against Kiran Ghuman because the action was not meritorious, and the unmeritorious nature would have been revealed had Plaintiffs had the opportunity to appropriately defend.

21. In the involuntary bankruptcy proceeding, Defendant sought various sums that were paid to Sukhi Ghuman or incurred by Octavian Security Limited between January and November 2009.

22. During that timeframe, Sukhi Ghuman did not have any day to day involvement with the company.

23. Ultimately, through various procedurals issues, a judgment was entered against Plaintiff in the United Kingdom arising out of the involuntary bankruptcy proceeding.

24. Notwithstanding the issuance of this foreign judgment, Plaintiff has strenuously disputed the propriety of that action, the jurisdiction of the British Courts over his person, and the enforceability of that judgment outside of Great Britain.

25. After this judgment was obtained, Defendant began engaging in a scheme to improperly destroy Plaintiff's life and business relationships in the United States. When it became apparent to the Defendant that there were no assets to attach within the United Kingdom, Defendant sought to cause maximum damage and harassment to the Plaintiff and Mrs. Ghuman.

26. Beginning in mid-2018, Defendant began contacting Sukhi Ghuman's business associates, relatives, and his wife.

27. Defendant issued numerous defamatory and threatening communications to Sukhi Ghuman's personal and business associates through early 2019.

28. Most of these communications were made from either burner phones or from restricted numbers, and several of these calls were made while Defendant was in a state of

3

2957407.v1

apparent intoxication.

29. Defendant contacted Plaintiff's wife on several occasions in mid to late 2018.

30. In those conversations, Defendant told Plaintiff's wife that Sukhi Ghuman would be destroyed, and indicated that she should divorce him for her own good, or words to that effect.

31. This caused Plaintiffs a great deal of emotional distress.

32. Mrs. Ghuman began screening her calls in order to avoid communicating with Defendant, but Defendant repeatedly called from new or disguised numbers to get through to her.

33. Defendant also made numerous similar threatening calls to Sukhi Ghuman directly.

34. In these calls, Defendant continually stated that he would "destroy" Sukhi Ghuman, would ruin him, indicated that he was contacting Plaintiff's business associates, and indicated that he was contacting his wife and other family members.

35. Defendant also sent threatening texts to Sukhi Ghuman.

36. In or about April 2018, Sukhi Ghuman was offered a role with Khangura Developments as the Vice President of Operations.

37. The annual salary of this position was $650,000, exclusive of bonuses.

38. Sukhi Ghuman expected to earn at least $100,00 a year in bonuses in this position.

39. Sukhi Ghuman was to be hired to run Khangura Developments' portfolio of hotels, as well as to manage and build additional hotels.

40. Sukhi Ghuman expected this to be a multi-year position.

41. Somehow, Defendant learned of Sukhi Ghuman's contemplated position with Khangura Developments.

42. Beginning in June 2018, Defendant began contacting Sukhbinder Kahangura, who is the President and an owner of Khangura Developments. Mr. Khangura is an Arizona resident.

4

2957407.v1

43. In a series of telephone calls subsequent to June 2018, and continuing through at least December 2018, Defendant contacted Mr. Khangura repeatedly, informing him about the involuntary bankruptcy action, the judgment, and telling him that he would be imposing a lien on any assets or business that Sukhi Ghuman was involved in. Defendant specifically threatened to place liens on the assets of Khangura Developments if Sukhi Ghuman were to be hired.

44. Defendant also falsely informed Mr. Khangura that due to the United Kingdom court ruling and judgment, that Sukhi Ghuman was unable to legally work anywhere in the world.

45. As a result of these threats and harassment, Mr. Khangura withdrew his offer of employment in or about December 2018, at which point he informed Sukhi Ghuman that the offer was being withdrawn and why it was being withdrawn.

46. He specifically informed Sukhi Ghuman that the offer was being withdrawn because Khangura Developments could not risk getting involved in lawsuits or getting its assets liened by Defendant.

47. Sukhi Ghuman additionally attempted to do business with another Arizona resident named Kevin Johnston in or around December 2018.

48. Mr. Johnston had expressed interest in investing with Plaintiff to expand his business known as Octavian Security Americas L.L.C.

49. In or about March 2019, Defendant informed Mr. Johnston of the involuntary bankruptcy and made similar assertions that he made to Mr. Khangura, including that he would place liens on Mr. Johnston's assets if he were to do business with Sukhi Ghuman.

50. Shortly thereafter, in or about May 2019, Mr. Johnston terminated the discussions concerning the investment with Sukhi Ghuman and Octavian Security Americas, L.L.C., and cited to his communications and threats from Defendant to justify that decision.

51. Kevin Johnston had previously informed Sukhi Ghuman that he would have invested approximately $500,000 to assist in the creation and operations of Octavian

5

Security Texas.

52. In or around April 2018. Sukhi Ghuman was heavily engaged with the set-up of a pan-African security company.

53. Sukhi Ghuman had previous extensive knowledge of operating in the Middle East and had formed, in partnership with Mr. Steven Giles (a former US military veteran, former law enforcement officer and private security operator), a prospective company called Octavian Africa.

54. The initial business was set up in Ghana in conjunction with Steve Giles and another multi-national organization Agility Logistics one which is in operation within approximately 80 countries globally.

55. Ghana was the contemplated starting point and trial to ascertain if Octavian Africa could grow within the other commercial markets that its strategic partners were based in.

56. Steven Giles had built an excellent reputation as a private security operator in hostile environments.

57. Upon information and belief, his experience included securing United States military soft goods in Iraq during the second gulf war, and other extensive security operations in Iraq, Sudan and Afghanistan.

58. In or around June 2018 and at the point where the expansion of Octavian Africa was at critical negotiation stage, the defendant made several threatening and harassing calls to Mr. Giles.

59. In these calls, Defendant made similar representations as he made to Mr. Khangura and Mr. Johnston above.

60. Mr. Giles was advised that Defendant would approach former and current clients with information regarding Sukhi Ghuman.

61. Mr. Giles was unaware of where Defendant had obtained information.

62. Defendant provided the details of his firm, Haslers, and requested that Mr. Giles contact him back or he would reach out to other strategic partners.

6

2957407.v1

63. Initially following a brief conversation with Plaintiff, he ignored the threat and did not mention it to Sukhi Ghuman.

64. However, Defendant contacted him on a further two occasions in subsequent months, the second under the apparent influence of alcohol.

65. Following a discussion with Plaintiff in late 2018, Mr. Giles indicated that Defendant was capable of causing severe reputational and other damage to the overall deal.

66. As a result of these issues, Sukhi Ghuman ceased his involvement with the company.

67. Sukhi Ghuman estimates that this company potentially could have been worth approximately 50 to 75 million dollars.

68. Mr. Giles was telephoned on one further occasion, to which he responded Plaintiff was no longer associated with the business. Upon learning that information, Defendant ceased calling Mr. Giles.

69. Upon information and belief, other similar statements and threats were made by Defendant to other of Sukhi Ghuman's friends, family members, and business associates.

70. The above referenced threats were without merit and were specifically designed to harm Plaintiffs and interfere with Sukhi Ghuman's business activities.

71. The above referenced threats were made maliciously and were specifically intended to harm Plaintiff, supporting the imposition of punitive damages.

## COUNT I
### (Intentional Interference with Contract)

72. All prior allegations are re-alleged as if fully set forth herein.

73. Plaintiffs had contractual relationships and/or potential contractual relationships with third parties as set forth above.

74. Defendant was aware of those relationships and contracts.

75. By his actions described above, including but not limited to, improperly threatening Plaintiffs' business associates, Defendant intentionally interfered with those

7

2957407.v1

relationships and contracts, thereby inducing or causing the third parties to breach those contracts.

76. Defendant's actions in interfering with Plaintiffs' contractual relationships was improper.

77. Defendant's conduct has caused Plaintiffs to lose business, revenue, and business opportunities, causing damages to Plaintiffs.

78. As a direct and proximate result of Defendant's conduct, Plaintiffs have been damaged in an amount to be determined at trial.

79. Defendant's actions were motivated by malice and ill-will and were without justification, justifying the imposition of punitive damages.

## COUNT II
### (Tortious Interference with Business Expectancies)

80. All prior allegations are re-alleged as if fully set forth herein.

81. Plaintiffs had valid business expectancies as set forth above.

82. Defendant was aware of Plaintiffs' relationships and business expectancies.

83. By the actions described above, including but not limited to, improperly threatening various third parties, Defendant intentionally interfered with those relationships and business expectancies thereby inducing or causing the third party to breach or terminate those expectancies.

84. Defendant's actions in interfering with Plaintiffs' business expectancies was improper.

85. Defendant's conduct has caused Plaintiffs to lose business, revenue, and business opportunities, causing damages to Plaintiffs.

86. As a direct and proximate result of Defendant's conduct, Plaintiffs have been damaged in an amount to be determined at trial.

87. Defendant's actions were motivated by malice and ill-will and were without justification, justifying the imposition of punitive damages.

8

2957407.v1

# COUNT III
### (Intentional Infliction of Emotional Distress)

88. All prior allegations are re-alleged as if fully set forth herein.

89. As set forth above, Defendant took actions that were designed to cause Plaintiffs extreme emotional distress.

90. Defendant's conduct was extreme and outrageous and highly offensive to a reasonable person.

91. As a direct and proximate result of Defendant's conduct, Plaintiffs have in fact suffered extreme emotional distress.

92. As a direct and proximate result of Defendant's conduct, Plaintiffs have been damaged in an amount to be determined at trial.

93. Defendant acted with malice and an evil mind, warranting an award of punitive damages.

WHEREFORE, Plaintiffs request the following relief against Defendant as follows:

A. For compensatory damages in an amount to be proven at trial.

B. For punitive damages in an amount to be proven at trial.

C. For Plaintiffs' costs incurred herein.

For such other and further relief as the court may deem just and proper.

DATED this 5th day of March, 2021.

SACKS TIERNEY P.A.

By: s/ Michael L. Kitchen
Michael L. Kitchen
Attorneys for Plaintiffs

2957407.v1

# CERTIFICATE OF SERVICE.

I hereby certify that on March 5, 2021, I electronically transmitted the foregoing Plaintiffs' Response to Defendant's Motion to Dismiss for Lack of Personal Jurisdiction to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Brian Del Gatto, Esq.
Taylor H. Allin, Esq.
**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**
2720 E. Camelback Rd., Suite 210
Phoenix, Arizona 85016
Brian.DelGatto@wilsonelser.com
Taylor.Allin@wilsonelser.com
*Attorneys for Defendant Nicholas Nicholson*

*s/ Brittany Crane*
Brittany Crane

10

2957407.v1